## Jacob Moster v. Terminal Railroad Association of St. Louis.

1. **MASTER AND SERVANT**—*Servant Assumes the Ordinary Risks of the Employment.*—The servant takes upon himself the ordinary hazards and risks of the work he is employed to do.

**Trespass on the Case,** for personal injuries. Appeal from the City Court of East St. Louis; the Hon. MARTIN W. SCHAEFER, Judge presiding. Heard in this court at the August term, 1902. Affirmed. Opinion filed March 2, 1903.

A. R. TAYLOR and FREELS & JOYCE, attorneys for appellant.

J. M. HAMILL, attorney for appellee.

MR. PRESIDING JUSTICE BIGELOW delivered the opinion of the court.

This action was brought by appellant against appellee to recover damages of appellee for injuries received by appellant while in the service of appellee.

The case was tried by a jury, and at the close of the evidence, on motion of appellee the court instructed the jury to return a verdict for the defendant, which being done, the court rendered judgment against appellant for costs, and he has brought the case to this court by appeal, and has assigned for error the instruction given to the jury.

Appellant was, and for about twenty years prior to the time

he received the injury complained of, had been, a bridge carpenter and worked at his trade. Appellee is a corporation and owns the bridge known as the "Eads bridge" across the Mississippi river which connects the city of St. Louis, Missouri, with the city of East St. Louis, Illinois. The bridge and its approaches has two roadways, one above the other. The lower roadway is a double track railway, over which passenger and freight trains run. The upper roadway is eighteen or twenty feet above the lower roadway and over it all of the traffic and travel between the two cities is carried, except that carried by the steam railways on the lower roadway. The upper roadway is forty or fifty feet in width. The bed of the roadway, as we understand it, is covered with thick planking laid upon sills that are held up by iron girders. These girders require to be renewed from time to time, and when this is being done, sections of the roadway above the girders must be elevated several inches, so that the old girders may be loosened and taken out, and their places may be supplied with new ones. In the summer of 1900, much of this work seems to have been done upon the upper roadway of the bridge and its approaches, and appellant assisted in doing more or less of that kind of work, and was fully acquainted with the method of doing it, being himself a skilled bridge carpenter and having had much experience in working on the Eads bridge as well as on other bridges. The methods of repairing the bridge was not to move a large section of it at any one time, nor to remove so much of it at any single time as to impede the travel and traffic over the roadway of the bridge, consequently but a small section of the upper roadway and its approaches was elevated at a time. The method of elevating a section of the bridge was by using a cap, a shore, and a jack. The cap consisted of two 6 x 14-inch pieces of timber bolted together, about twenty feet in length. The shore was a stick of pine timber seven or eight inches square and sixteen or eighteen feet in length. The jack was an ordinary twenty-ton hydraulic machine, thirty or thirty-two inches high, and was worked

by hand by what is called "pumping" it, with a handle or lever.

On the 24th of August, 1900, appellant, with others of a crew of men, attended to setting the jack on a piece of plank about two feet in length, laid on the lower roadway, which seems to have been constructed of solid material, and the shore was so placed and adjusted that the lower end of it stood on the top of the jack, and the upper end was so adjusted as to come under the cap, the north end of which was resting on a post and the south end was resting on the south wall of the bridge.

There were working with appellant in, raising the section of the floor of the upper roadway, and in putting in false work to keep secure whatever was done, a number of fellow-workmen, but appellant seems to have had special charge and control of the jack at least, if nothing else. On the date before stated, when all was ready to raise the section of the roadway of the bridge as contemplated, appellant applied himself to the pumping lever of the jack with all the power he possessed; when the shore "kicked" and fell against him, by which he was seriously injured.

Appellant in his testimony as abstracted said:

"I had worked with different kinds of jacks for twenty years, ever since I commenced work as a carpenter. Before commencing to put in this false work, I helped remove half of the upper roadway; about half the width and about 200 feet in length; it was the north part that was removed this, time and the south side was the part we were jacking up; the jack was set about fifty or sixty feet from the west end of this space; the south half was left remaining to carry the traffic, I suppose; I was within five or six feet of the north side of that part of the bridge floor that remained; I had worked with a jack in raising the flooring of the upper roadway for several days prior to this time; I don't remember the time exactly. You could notice a tremor in the jack and shore when there was any pressure from above; we had to reset the jack and shore occasionally when we put them in a new place and did not get them entirely plumb; we find out whether or not the jack and shore are in perfect plumb by looking at them;

if they are not plumb they will kick out, and if they are in perfect plumb the power will be applied all right and the structure will be raised if there is not too much weight, and even if they are in perfect plumb they would kick out when there is too much weight on them."

The claimed negligence of appellee, which was the cause of the injury, is alleged in the declaration to have been in not furnishing appellant a reasonably safe place in which to perform the work he entered upon doing, and particularly in not using ordinary care, either to prevent heavy vehicles from passing over the bridge while plaintiff was so at work, and in not informing or giving notice to plaintiff of the passage of such vehicles, and of the danger therefrom, in time for plaintiff to escape from the danger of being injured, and in failing to find a secure support for the jack.

There is really but one question to be determined in the case and that is, is the entire evidence in the case, with all the inferences that may be reasonably drawn from it in favor of appellant, sufficient to warrant the submission of the case to the jury?

The burden of proof to establish the negligence alleged in the declaration, or as much of it as would sustain a verdict for the plaintiff, if one was found by the jury, rested upon appellant in this case. Sack et al. v. Dolese, 137 Ill. 129. If it be conceded that appellant was doing dangerous work, in a dangerous place, in a dangerous manner, and was injured thereby, such facts do not entitle him to recover damages of his employer for the injury he has suffered. To hold that they do, is to hold the employer an insurer of life and limb of appellant.

Appellant was an experienced bridge carpenter, and before he was injured had been in the employ of appellee, doing the same character of work, on the same bridge and its approaches, in the same manner he was doing it when he was injured. From his own testimony it appears that he understood the danger attending his work. He knew what was beneath him, what was above him, and what was around him on all sides, for he was in the full possession

of all his faculties. He knew how to do the work he was employed to do, and he received the wages of a skilled mechanic. He knew how and where to set the jack, and how to place the shore, and that both must be kept perpendicular at all times while in use, or danger was pretty sure to follow. Being a skilled mechanic, he knew, or ought to have known, if the jack or shore was out of plumb; and if so, that neither should be used until put in a proper and safe condition again for use; and he can not be heard to say that he did not know that either was out of plumb, or that he relied on the word of an ignorant person, who assured him that they were " all right."

When he contracted to sell his services to appellee for $2.50 per day, it was not as a common laborer that he was to work, and he took upon himself, by his contract, the risks and hazards of the work he was to do, for he was in the prime of life, and it must be presumed he was able to take care of himself.

He knew that only a portion of the upper roadway of the bridge and its approaches was to be raised at one time, and that a part of the roadway over or across the bridge was kept open and in use in carrying the traffic and travel between the two cities, and if there was danger that the passage of loaded teams and vehicles over the bridge would cause the shore and jack which he was using to get out of plumb, he must have known it; if he did not, how could it be expected that appellee could know it?

There is no real evidence whatever that the passing of one or more loaded wagons over the bridge caused the shore and jack to get out of plumb, thus causing the shore to kick and fall against appellant. Doubtless many loaded vehicles crossed over the bridge on the day appellant was injured, and if one heavily loaded wagon passed over at or about the time the shore kicked, the most that can be said of the two acts is, that they were merely coincident with each other. We think appellant gives in his testimony a much more reasonable theory as to what caused the shore to kick, than to suppose it was caused by vehicles passing

over the bridge, thus putting the shore out of plumb. He says:

"We find out whether or not the jack and shore are in perfect plumb by looking at them; if they are not plumb, they will kick out, and if they are in perfect plumb the power will be applied all right, and the structure will be raised if there is not too much weight, and even if they are in perfect plumb, they would kick out when there is too much weight on them."

The evidence of appellant above quoted, with his further evidence that he worked the jack to the extent of his ability, furnishes, at least, strong evidence that what caused the jack and shore to kick, was, that "too much weight" was placed upon them.

But it makes no difference which theory is correct, or whether either is, since appellant knew the condition of his surroundings and that loaded teams were constantly crossing over the bridge, and that enough of the bridge was to be kept open at all times to carry on the traffic, while the bridge was being repaired. He saw and heard the traffic going on every day he was at work there, and he made no request of appellee to stop the traffic at any time; if he had done so, and had received a promise that his request should be complied with, but was not so complied with within a reasonable time after the promise was made, and that thereafter he was injured in consequence of the jarring of the bridge by loaded teams passing over it, his case would have been much different from what it now is, and the bridge association would have been liable; but as the case now stands, he, by his contract with appellee, took upon himself the hazards and risks of the work he was employed to do, and can not recover for the injuries received, for the simple reason that appellee has done him no wrong by the omission of any duty owed him, or by the commission of any wrong done to him.

This rule of the law is so familiar that to cite authorities in support of it would seem to be useless.

The court committed no error in taking the case from the jury, and the judgment is affirmed.